IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 2:05cr137-F |
| | ) | |
| GEORGE DAVID SALUM, III | ) | |

GOVERNMENT'S EMERGENCY MOTION FOR PROTECTIVE "GAG" ORDER

COMES NOW the United States of America, by and through its attorneys, Gregory R. Miller, United States Attorney for the Northern District of Florida, and the undersigned Assistant United States Attorney, and files this emergency motion seeking this Court's order that Counsel for Defendant not participate in press conferences and interviews seeking to "present the defendant's side of the story" in advance of and during trial.

**Statement of Facts**

1.

On Wednesday, November 2, 2005, the undersigned learned that Attorney Julian L. McPhillips, Jr., Counsel for Defendant, had contacted at least one Montgomery, Alabama, television reporter asking the reporter to interview Mr. McPhillips for the purpose of Mr. McPhillips' publicly describing Defendant SALUM's "side of the story," or words to that effect.

2.

This Court announced during the November 1, 2005, status conference in this case that the Court will not permit the trial of the case to be "a circus," and that the Court will limit the trial of the case to those issues properly before the jury. This Court further confirmed that jury selection will occur on Monday, November 7, 2005, with the trial of the case to occur shortly

thereafter.

3.

By engaging in such interviews or disclosures, oral or written, Counsel for Defendant exposes the venire panel to information which may not be admitted by this Court in the trial of the case pursuant to the Federal Rules of Evidence and this Court's orders. There is no legitimate purpose for appearing on television or in the newspapers to describe the defendant's position at this point in the chronology of this case.

4.

Unless this Court issues a protective order proscribing this conduct, irreparable harm may be done to this Court's effort to seat a jury whose verdict must be based solely upon evidence properly admitted at trial. It is, in effect, Counsel for Defendant doing outside the courtroom what he cannot do inside the courtroom, to the prejudice of a fair and impartial resolution of the issues.

5.

The United States has made no public statement regarding this case, other than the issuance of a standard press release summarizing , without comment, the "public record" contents of the indictment when returned by the Federal Grand Jury and only after the defendant made his initial appearance in May 2005. On each occasion when a member of the "Fourth Estate" sought comment beyond that press release, the undersigned and the United States have declined – consistent with the fundamental principle that the trial of this case will occur inside the courtroom, and fully cognizant of the potential to inappropriately influence the jury pool. The United States will, of course, continue that practice.

**Argument**

This Court has broad discretion in issuing a "gag" order to restrain trial participants from making extrajudicial statements, when there is a reasonable likelihood that prejudicial publicity may prevent a fair trial. *See, e,g,,* Robert S. Stephen, *Prejudicial Publicity Surrounding a Criminal Trial: What a Trial Court Can Do to Ensure A Fair Trial in the Face of a 'Media Circus,'"* 26 SUFFOLK U. L. REV. 1063 (1992). In *Sheppard v. Maxwell,* 384 U.S. 333 (1966), one of the seminal Supreme Court decisions governing the control and effect of publicity surrounding a criminal trial, the Supreme Court stated that it was the obligation of the trial court to control release of information to the media. *Id.* at 361-62. The Supreme Court made it clear that a trial judge is permitted and should consider issuance of a "gag" order to prevent participants in a criminal trial from frustrating the proper functioning of criminal court proceedings, under circumstances where pretrial publicity would threaten the due administration of justice. *Id.* Finding that the trial court should have exercised its "power to control the publicity about the trial, the Court asserted:

> (T)he court should have made some effort to control the release of leads, information, and gossip to the press by police officers, witnesses, and counsel for both parties. Much of the information thus disclosed was inaccurate, leading to groundless rumors and confusion . . .
>
> The fact that many of the prejudicial news items can be traced to the prosecution, as well as the defense, aggravates the judge's failure to take any action. . . . Effective control of these sources concededly within the court's power might well have prevented the divulgence of inaccurate information, rumors, and accusations that made up much of the inflammatory publicity, at least after Sheppard's indictment.
>
> More specifically, the trial court might well have proscribed

>   extrajudicial statements by any lawyer, party, witness, or court
>   official which divulged prejudicial matters . . . or like statements
>   concerning the merits of the case.

*Id.* at 359-62.

While *Sheppard* spoke to the threat publicity posed to the defendant's right to a fair trial, the same rationale guides this Court's protection of the United States' right to a fair trial. In *Sheppard,* where the defendant's conviction was overturned because extensive prejudicial pretrial publicity had denied the defendant a fair trial, the Court held that a new trial was a remedy for such publicity, but observed:

>   (w)e must remember that reversals are but palliatives; the cure lies
>   in those remedial measures that will prevent the prejudice at its
>   inception. The courts must take such steps by rule and regulation
>   that will protect their processes from prejudicial outside
>   interferences. Neither prosecutors, counsel for defense, the
>   accused, witnesses, court staff nor enforcement officers coming
>   under the jurisdiction of the court should be permitted to frustrate
>   its function. Collaboration between counsel and the press as to
>   information affecting the fairness of a criminal trial is not only
>   subject to regulation, but is highly censurable and worthy of
>   disciplinary measures.   384 U.S. at 36.
>
>   We expressly contemplated that the speech of those participating before the courts
>   could be limited. [FN5] This distinction between participants in the litigation and
>   strangers to it is brought into sharp relief by our holding in *Seattle Times Co. v.
>   Rhinehart*, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984). There, we
>   unanimously held that a newspaper, which was itself a defendant in a libel action,
>   could be restrained from publishing material about the plaintiffs and their
>   supporters to which it had gained access through court-ordered discovery. In that
>   case we said that "[a]lthough litigants do not 'surrender their First Amendment
>   rights at the courthouse door,' those rights may be subordinated to other interests
>   that arise in this setting," *Id.*, at 32-33, n. 18, 104 S.Ct., at 2207-2208, n. 18
>   (citation omitted), and noted that "on several occasions [we have] approved
>   restriction on the communications of trial participants where necessary to ensure a
>   fair trial for a criminal defendant." *Ibid.*

"As for extrajudicial statements by defense counsel and prosecutors, the standards of

4

professional responsibility in every state include a provision placing limits on the content of their statements under specified circumstances." Wayne R. LaFave et al, CRIMINAL PROCEDURE, Sec. 23.1(b); Ala.R.Prof.Conduct 3.6. The Supreme Court analyzed the rationale for such limits in *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991). There, the issue was one of professional ethics. *Gentile* involved the analysis of the Nevada Supreme Court rule prohibiting an attorney from making extrajudicial statements to the press, when he reasonably should know that such statements have a "substantial likelihood of materially prejudicing" an adjudicative proceeding. *Id.* at 1071. The attorney in *Gentile* called a press conference the day after the indictment of his client in a highly publicized case, "to counter public opinion which he perceived as adverse to his client, to fight back against the perceived efforts of the prosecution to poison the prospective juror pool, and to publicly present his client's side of the case." *Id*. The Court concluded that the attorney had abided by the Nevada rule, and reversed the state supreme court decision that he should be disciplined. The Court noted, however:

> It is unquestionable that in the courtroom itself, during a judicial proceeding, whatever right to "free speech" an attorney has is extremely circumscribed. An attorney may not, by speech or other conduct, resist a ruling of the trial court beyond the point necessary to preserve a claim for appeal. *Sacher v. United States*, 343 U.S. 1, 8, 72 S.Ct. 451, 454, 96 L.Ed. 717 (1952) (criminal trial); *Fisher v. Pace*, 336 U.S. 155, 69 S.Ct. 425, 93 L.Ed. 569 (1949) (civil trial).

Regarding conduct outside the courtroom, a majority of the Court in two separate opinions in *In re Sawyer,* 360 U.S. 622, 79 S.Ct. 1376, 3 L.Ed.2d 1473 (1959), further observed that lawyers in pending cases were subject to ethical restrictions on speech to which an ordinary citizen would not be. There, the Court had before it an order affirming the suspension of an attorney from practice because of her attack on the fairness and impartiality of a judge. The

plurality opinion, which found the discipline improper, concluded that the comments had not in fact impugned the judge's integrity. Justice Stewart, who provided the fifth vote for reversal of the sanction, said in his separate opinion that he could not join any possible "intimation that a lawyer can invoke the constitutional right of free speech to immunize himself from even-handed discipline for proven unethical conduct." *Id*., at 646. He said that "[o]bedience to ethical precepts may require abstention from what in other circumstances might be constitutionally protected speech." *Id*., at 646-647. The four dissenting Justices who would have sustained the discipline said:

> Of course, a lawyer is a person and he too has a constitutional freedom of utterance and may exercise it to castigate courts and their administration of justice. But a lawyer actively participating in a trial, particularly an emotionally charged criminal prosecution, is not merely a person and not even merely a lawyer. . . .
> He is an intimate and trusted and essential part of the machinery of justice, an 'officer of the court' in the most compelling sense. *Id.*, at 666, 666 (Frankfurter, J., dissenting, joined by Clark, Harlan, and Whittaker, JJ.).

In the case of *The News-Journal Corp. v. Foxman*, 939 F.2d 1499 (11th Cir. 1999), the Eleventh Circuit Court of Appeals reiterated the holding of the *Gentile* case:

> The Supreme Court views prior restraints directed to the press with a heavy presumption against their constitutionality. See *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 570, 96 S.Ct. 2791, 2808, 49 L.Ed.2d 683 (1976); *New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971) (discussing the constitutional problems with prior restraints specifically against the press). The Second Circuit, in upholding a restrictive order on trial participants in the widely publicized criminal trial of officials of the Wedtech Corporation, delineated that "there is a fundamental difference between a gag order challenged by the individual gagged and one challenged by a third party; an order objected to by the former is properly characterized as a prior restraint, one opposed solely by the latter is not." *In re Dow Jones & Co.*, 842 F.2d at 609; *see Nebraska Press,* 427 U.S. at 564, 96 S.Ct. at 2805 (orders prohibiting the extrajudicial commentary of trial participants are less restrictive than prior restraints on the press for averting the effect of prejudicial pretrial publicity); *see*

*also Gentile v. State Bar*, 501 U.S. 1030, ----, 111 S.Ct. 2720, 2744, 115 L.Ed.2d 888 (1991) ("[T]he speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press.... Lawyers representing clients in pending cases are key participants in the criminal justice system, and the State may demand some adherence to the precepts of that system in regulating their speech as well as their conduct."). Significantly, the Supreme Court has suggested a restrictive order limiting extrajudicial commentary of trial participants as an alternative to a prior restraint on the media. *[FN16] Sheppard v. Maxwell,* 384 U.S. 333, 361, 86 S.Ct. 1507, 1521, 16 L.Ed.2d 600 (1966). . . . One commentator has found that a gag order on trial participants is a feasible alternative to a prior restraint on the media in a highly publicized criminal trial because the other alternatives do not sufficiently safeguard the fair trial rights of a defendant. *Stabile, Free Press-Fair Trial: Can They Be Reconciled in a Highly Publicized Criminal Case?,* 79 Geo.L.J. 337 (1990). Postponement may encroach on the accused's right to a speedy trial and may actually increase publicity in a case of great public interest; change of venue involves delay presenting the problems associated with postponement, local communities have an interest in local adjudication, and a highly publicized criminal case likely will cause prejudicial information to be disseminated nationally, rendering change of venue ineffective; voir dire cannot remove individuals who have read previous newspaper accounts and a larger jury pool may result in a greater number of people who have been exposed to prejudicial publicity or to a delay in voir dire with an enhanced opportunity for improper publicity to occur; jury sequestration not only is a drastic measure, requiring the jurors to compensate for the publicized actions of trial participants, but also lengthy jury sequestration can cause the bias of resentment, the desire to end deliberations, and cannot remove prejudice from publicity prior to impanelment; and jury instructions may be ineffective regardless of pretrial publicity because the great detail present in jury instructions in a highly publicized criminal trial may not highlight precisely the issues that the jurors are being instructed not to consider. *Id.* at 343-45.

The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. 384 U.S. at 362, 363, 86 S.Ct. at 1522 (emphasis added). In *Nebraska Press*, the Court endorsed the *Sheppard* recommendations as useful aids to the "major responsibility" of a trial judge in mitigating the effects of pretrial publicity as opposed to entering a prior restraint against the press. *Nebraska Press*, 427 U.S. at 555, 96 S.Ct. at 2801. The Court stated that "[t]he capacity of the jury eventually impaneled to decide the case fairly is influenced by the tone and extent of the publicity, which is in part, and often in large part, shaped by what attorneys, police, and other officials do to precipitate news coverage." 427 U.S. at 554-55, 96 S.Ct. at 2800-01.

The United States is aware that remedies to ameliorate the harmful impact of extrajudicial

comment to the media about a pending case include continuance or change of venue. *Sheppard* at 362. The need for either is avoided if this Court issues a protective order. The United States made no effort to restrict Counsel for Defendant's earlier public statements, which began before Defendant SALUM was charged and resumed with the return of the indictment. *See, e.g., "Former MPD Officer Indicted," The Montgomery Advertiser, May 26, 2005*; *"Attorney Disputes Charge Against Former Montgomery Officer," Ledger-Enquirer, May 27, 2005*. However, the circumstances are now considerably different: jurors are scheduled to be selected within days, and the trial of the case is about to begin.

    WHEREFORE, in the interest of justice, the United States requests that the Court issue a protective order prohibiting the parties from commenting to the news media from the issuance of the order until the return of the jury's verdicts.

    RESPECTFULLY SUBMITTED this 2nd day of November, 2005.

    GREGORY R. MILLER
United States Attorney

**/s/Dixie A. Morrow**
DIXIE A. MORROW
Assistant United States Attorney
Florida Bar No. 0354589
Georgia Bar No. 525543
Texas Bar No. 24034796
Northern District of Florida
21 E. Garden Street, Suite 400
Pensacola, Florida 32502
(850) 444-4000

CERTIFICATE OF SERVICE

    I hereby certify that I have this date served a copy of the foregoing GOVERNMENT'S EMERGENCY MOTION FOR PROTECTIVE ORDER upon the defendant by electronic filing with and noticing by the Clerk of Court to his counsel of record: Julian L. McPhillips, Jr., McPHILLIPS SHINBAUM LLP, Post Office Box 64, Montgomery, Alabama 36101.

    THIS 2nd day of November, 2005.

                                              **/s/Dixie A. Morrow**
                                              DIXIE A. MORROW
                                              Assistant United States Attorney
                                              Florida Bar No. 0354589
                                              Georgia Bar No. 525543
                                              Texas Bar No. 24034796
                                              Northern District of Florida
                                              21 E. Garden Street, Suite 400
                                              Pensacola, Florida 32502
                                              (850) 444-4000