IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.   )<br>)<br>**GEORGE DAVID SALUM, III**   ) | CASE NO. **2:05-CR-137-F** |

### DEFENDANT'S AMENDED MOTION FOR ACQUITTAL OR FOR NEW TRIAL

COMES NOW the Defendant, George David Salum, III, by and through his attorneys of record, and respectfully amends his prior motion (Doc. 95), and thus again moves this honorable Court, pursuant to Federal Rules of Criminal Procedure 29 and 33, to acquit the Defendant, or, in the alternative, to grant the Defendant a new trial, on the grounds set forth below.

This motion contains two amendments, namely that certain information about the trial jurors has been removed from the footnote on page 8, and Ground 9 on page 12 has been amended to reflect that testimony about the Mayor was admitted, not about the Chief of Police, as previously stated.

### I. SUMMARY OF GROUNDS

This Court should **acquit** the defendant base on insufficiency of evidence. In the alternative, this Court should grant the defendant a **new trial** based on verdict coercion, judicial error, and unconstitutional vagueness of the statute as applied.

### II. ARGUMENT

**Ground 1**
**There was Insufficient Evidence That a Website, Blessed by Two Federal Judges, Was Created to Obstruct Justice.**

Under Rule 29 of the Federal Rules of Criminal Procedure, this Court may acquit

the defendant if the evidence was insufficient to support a conviction. In this case it was, and therefore the defendant should be acquitted of both counts of the Indictment.

This case should have never gone to trial. This Court erred in allowing an Obstruction of Justice Charge to go to a jury, where the gravamen of the charge was a website, which had been studied and approved by two federal judges.

On May 25, 2005, an Indictment was entered against Defendant George David Salum, charging him with violating 18 U.S.C. §1503 and 18 U.S.C. §1030. The Indictment was based on allegations that Defendant Salum obtained, and then released to a private investigator, four criminal history reports, and the photo and personnel file of a former police officer.

The government failed to show a plan to intimidate witnesses, and failed to show any connection between releasing the items and obstruction of justice. Further, a witness cannot be intimidated by an act of which they know nothing. The criminal history checks were not used in any way which would have alerted the four witnesses to their existence. The MPD personnel file for Raymond David DeJohn was also subpoenaed by Attorney Stephen Glassroth, and was used for impeachment at trial, if at all.

This only leaves the photograph of DeJohn which was published on the website, www.carmichaelcase.com. Raymond DeJohn did, in fact, become aware of the posting of his photo, but ultimately testified at Carmichael's trial, showing he was not intimidated by the posting at all. In addition, there were two other photographs of DeJohn on the website that were lifted from a United States Attorney's official website.

The photograph was eventually posted on a website created by Montgomery attorney Stephen Glassroth, as part of his representation of Leon Carmichael, who was

2

facing narcotics charges in the Middle District of Alabama. The website's stated purpose was to solicit information in preparation for trial.

The question, then, is whether the website was intended to intimidate witnesses. The answer is resoundingly negative. On its face, the website made clear it was in no way intended to intimidate or threaten anyone. The sole purpose of the website, as testified to by Cubie Ray Hayes and Johnny G. White, was to solicit information "because everyone deserves a fair trial.

In fact, after a hearing on the matter on March 1, 2004, Magistrate Judge Delores Boyd found that there was no evidence that the website constituted harassment, causing substantial emotional distress in a person. Judge Boyd went on to find that there was not enough evidence to find the requisite intent to "influence, delay or prevent the testimony in any official proceeding" under 18 U.S.C. §1512. United States v. Carmichael, 326 F.Supp.2d 1267, 1274 (2004).

District Court Judge Myron Thompson also denied the government's motion for a protective order directing Carmichael to remove the website from the internet, stating:

> The court finds that it is has the authority--by virtue of federal statute and its inherent power--to restrict or shut down a website. However, the court cannot grant the government's motion for three reasons grounded in the protections granted to Carmichael by the *Bill of Rights*. First, even though the website's content taken as a whole is not at the core of the *First Amendment*, the site constitutes protected speech. Second, the government's proposed protective order would be a prior restraint on Carmichael's protected speech, and the government has not convinced the court that such drastic relief is warranted. Third, the harm posed by the website does not warrant restricting Carmichael's *Fifth* and *Sixth Amendment* right to investigate his case by using the website to gather evidence. Id. at 1267.

3

There was no evidence that the website was created to obstruct justice in any way. To the contrary, the only evidence was that the intent in creating the website was for solicitation of evidence by an attorney to prepare an adequate defense for his client. Because the government failed to prove the website was for the purpose of intimidating witnesses, this case should not have been brought against Defendant Salum, because there was no obstruction of justice to aid or abet.

## Ground 2
### There was Insufficient Proof of Requisite Knowledge or Intent on the Part of Defendant Salum.

Importantly, the government failed to prove the requisite knowledge or intent on the part of the Defendant for both the §1503 and §1030 charge against him.

Even <u>if</u> the website were deemed a threat, and in no way does the Defendant concede the government met its burden on this point, the government absolutely failed to prove that Defendant Salum had the requisite intent. The government presented a good deal of evidence that Defendant Salum physically performed the acts in question, but was unable to show Defendant Salum had any knowledge of any scheme to obstruct justice.

18 U.S.C. §1503 makes it a crime for anyone to corruptly endeavor to influence, obstruct or impede the due administration of justice. The elements, as set forth in the charge read to the jury are:

<u>First</u>: That there was a proceeding pending before this Court as described in the indictment; and

<u>Second</u>: That the Defendant knowingly and corruptly endeavored to influence, obstruct or impede the due administration of justice in that judicial proceeding as charged.

The only government witness who purported to have any first-hand knowledge

4

whether Defendant Salum knew about any scheme to "influence, obstruct or impede the due administration of justice" was Johnny G. White. On direct examination, Johnny G. White initially testified that he told Defendant Salum he was working on "the Carmichael case" when he asked Salum for information about Raymond David DeJohn. On cross examination, however, White admitted that he "assumed" Salum knew what Carmichael he was referring to, because the Leon Carmichael criminal case had been widely publicized in the news.

The defendant's wife, Sonya Salum, testified that her husband has no interest in the news, that their family does not subscribe to any newspaper, and that "if [Dave] gets the remote, then it's sports." Mrs. Salum went on to explain that the defendant is a huge fan of sports, but admitted that he also loves watching game shows with their youngest daughter, Amber.

The defendant also testified that he does not watch or read the news, as he finds it boring. Defendant Salum did not watch television while at work, and pointed out that he had not even been at work very much, due to his older daughter's escalating medical problems at the time, which required his taking time off to transport her to doctors and hospitals.

Under Rule 29(c) of the Federal Rules of Criminal Procedure, a defendant may move for a judgment of acquittal, and if the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal. The evidence presented at trial was inadequate, and therefore, this Court must acquit the Defendant of all charges against him.

Federal Rule of Criminal Procedure 29 performs the vital function in a criminal

case of protecting defendants from conviction based on inadequate evidence. <u>United State v. Ubl</u>, 472 F.Supp 1236 (N.D. Ohio 1979). In deciding a Rule 29 motion, the court must view all evidence in the light most favorable to the government. If any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, then the jury's verdict must be upheld. <u>United States v. Ramirez</u>, 313 F.Supp 276 (S.D. NY 2004)

In this case, however, no rational person could have found that the elements of the crime were proven beyond a reasonable doubt. The Defendant did not have the knowledge or intent set forth in the elements of the charges against him. Therefore, the jury's verdict should be rejected, and Defendant Salum should be acquitted.

### Ground 3
### The Jury was Coerced Into Making a Verdict.

Under Rule 33(a) of the Federal Rules of Criminal Procedure, the court may vacate any judgment and grant a new trial if the interest of justice so requires. The jury was coerced into rendering its verdict, and justice requires that this Court grant the defendant on this ground alone.

The jury thrice indicated it was deadlocked and requested clarification on knowledge and intent elements in their charge. A jury was empanelled on Monday, November 7, 2005. Trial lasted three days, concluding at 3:00 p.m. on Thursday, November 10th. The jury deliberated from that time until it reached a verdict at 9:35 p.m.

At 4:35 p.m., after deliberating 1 hour 35 minutes, the jury sent a note to the Court that it had reached a verdict on one count, but was deadlocked on the meaning and application of intent in the second element of the §1503 charge. Specifically, the jury asked the court whether the Defendant had to have intended to obstruct justice. The Court

6

advised the jury to continue with deliberations at that time, and read the Offense Instruction for §1503 again in its entirety.

At 6:40 p.m., the jury sent a note to the court stating they were hopelessly deadlocked and asking for the definition of "specific intent." The Court declined to give the jury any further instructions at that time.

At 7:08 p.m., after deliberating over four hours, the jury once again notified the Court that there were members of the jury who would not change their positions. The jury was clearly frustrated because many words in the note were in all bold and underlined more than once. The Defendant requested a mistrial as to the count as yet undecided by the jury. Instead, the Court administered a modified "Allen" charge, at the Government's request. (Doc. 91-2).

At this time, the Court also allowed the Jury to call their friends and family "to let them know where they were." Although the Court instructed the jurors not to discuss the case, there was no way to prevent the people on the other side of the phone from urging jurors to just decide the case so they could come home.

At 8:20 p.m. the Court received a note from the jury that it was still deadlocked. The judge asked the jury to decide if further deliberations would be useful, and, if so, then to decide whether they wanted to continue deliberations that night or return the next day, Veteran's Day, or Monday, after the holiday. The jury sent a note to the Court that they would continue their deliberations that night, and returned their verdict at 9:35, after having deliberated six and a half hours.

The jury was clearly confused, and did not understand what the government was required to prove. The jury was also under a great deal of pressure from the Court to

7

make a decision.

The Defendant is entitled to a new trial because the jurors were coerced into making their decision.

When the verdict in this case was reached, the jurors had not eaten since their lunch at 11:30 a.m. Many of the jurors lived hours away.[1] Three quarters of the jury lived outside of Montgomery, and these jurors faced an average travel time of approximately two hours. Juror 10 would not get home until well after midnight.

These jurors were under incredible stress, not only mental, but also physical. Put simply, these men and women were exhausted, starving and facing long drives home, when the Court asked them to either agree on a verdict or look forward to driving two hours back on a holiday to continue deliberations.

In determining whether an Allen charge has an impermissibly coercive effect on jury deliberations, the reviewing court should consider the content of the instruction as well as the context. Jenkins v. United States, 380 U.S. 445, 446, 13 L. Ed. 2d 957, 85 S. Ct. 1059 (1965). "Jury coercion is determined by (1) the content of the instruction, (2) the length of the deliberation after the instruction, (3) the total length of deliberations, and (4) any indicia in the record of coercion." United States v. Hagan, 412 F.3d 887, 890 (8th

---

[1] Jurors' Hometowns with Driving Times from the Courthouse, and Jury Pool Member Number:
Juror 1. Montgomery; 01-0163
Juror 2. Auburn – **1 hour 17 minutes**; 01-0171
Juror 3. Montgomery; 01-0175
Juror 4. Notasulga – **1 hour 12 minutes**; 01-0177
Juror 5. Goshen – **1 hour 45 minutes**; 01-0179
Juror 6. Montgomery; 01-0190
Juror 7. Lafayette – **2 hours 2 minutes**; 01-0196
Juror 8. Auburn – **1 hour 17 minutes**; 01-0199
Juror 9. Dothan – **2 hours 47 minutes**; 01-0200
Juror 10. Enterprise – **2 hours 36 minutes**; 01-0099
Juror 11. Pittsview – **2 hours 14 minutes**; 01-0103
Juror 12. Valley – **1 hour 48 minutes**. 01-0105

8

Cir. 2005), Citing United States v. Walrath, 324 F.3d 966, 970 (8th Cir. 2003).

There has long been a concern that the instruction to the minority members may be impermissibly coercive, which is why many courts now only administer the Allen charge with an instruction to both the minority and the majority on the jury to reconsider their positions in light of the other side's views. United States v. Burgos, 55 F.3d 933, 941 (4th Cir. 1995); United States v. West, 877 F.2d 281, 291 (4th Cir. 1989), cert. denied, 493 U.S. 959, 107 L. Ed. 2d 362, 110 S. Ct. 377 (1989).

Even with the instruction to both, the pattern Allen Instruction is per se coercive if the Court inquires into the numerical division of the jury. This Court gave this instruction, but knew that only one or two jurors were holding out, because that fact was disclosed in one of the jury's notes. When the Court gave the Allen charge, the minority in this case had reason to believe the Court was directing its instruction to them, which was per se coercive.

Over the Defendant's objection, the Court exacerbated the jury's stress with an instruction that trials are expensive, both in time and money, and asking the minority to reconsider its position. (Doc. 91-2) Although this instruction is a pattern instruction, approved by the Eleventh Circuit Court of Appeals, its use **under the circumstances** described above was improper and created a situation paramount to duress for the jury.

In United States v. Rogers, 289 F.2d 433, 436 (4th Cir. 1961), a quick verdict after an Allen charge was "hardly long enough to have permitted a painstaking re-examination of the views which the minority had held steadfastly until the charge was given." Similarly, the jury in this case had been frustrated and hopelessly deadlocked, but

9

very quickly reached a verdict after the Allen charge and an additional instruction to decide whether they wanted to continue late into the night or come back on a holiday or the following Monday.

Because the circumstances surrounding the jury's deliberations coerced the dissenting jurors into surrendering their positions, the Defendant should have a new trial.

### Ground 4
### The Court Erred in Not Enforcing the Subpoena to Stephen Glassroth.

There were numerous erroneous rulings which were highly prejudicial to the Defendant, and support granting of a new trial. The record reflects that the Defendant moved for mistrial no less than 11 times in the course of the trial.

Prior to trial, the Court ruled that Stephen Glassroth should testify, but that his subpoena was defective. The Court erred in refusing to enforce Glassroth's subpoena and in refusing to provide adequate remedy when it became clear that Glassroth was evading service, despite Glassroth's paralegal's daily presence at trial.

Stephen Glassroth was the only person, other than the Defendant, who could testify that he had never met the Defendant and that the Defendant was never on his payroll. Any self-serving evidence brought in through the testimony of the Defendant is suspect in the minds of the jury, so the evidence was not as strong as it would have been, had Glassroth testified.

Also, without Glassroth's testimony, the Defendant was effectively forced to testify himself, waiving his Fifth Amendment right against doing so.

### Ground 5
### The Court Erred in Denying a Mistrial When Government Did Not Timely Provide Jenks Act Material.

Prior to trial, the Court denied a motion for mistrial when the government did not

timely provide Jenks Act material the day before witnesses were to testify, as promised previously. The material was voluminous, and counsel did not have any meaningful opportunity to review the material before the corresponding witnesses testified. This prejudiced the Defendant a great deal, frustrating the undersigned in adequate preparation for trial.

### Ground 6
### The Court Erred in Excluding Information About Raymond DeJohn's Civil Case.

Prior to trial, at a Motion in Limine hearing, the Court ruled that evidence of Raymond DeJohn's financial interests in the criminal case were admissible. During opening statements, the government's objection to mention of DeJohn's civil suit was sustained. This was clear error, as the existence of a civil suit goes straight to credibility of the witness. The Defendant made it clear to the Court in advance that the Defendant planned to call DeJohn, if the government did not.

In the end, while neither the government nor the defense called DeJohn as a witness, there were other government witnesses who testified that DeJohn received extraordinary witness protection due to the website. Defendant Salum was denied the opportunity to show, by evidence of DeJohn's civil lawsuit, that what really motivated DeJohn in requesting extraordinary protection was not intimidation, but rather a desire for financial gain. The exclusion of this information greatly prejudiced the Defendant.

### Ground 7
### The Court Erred in Excluding Testimony from Matthew Kallman Regarding the Former Chief of Police Who Released a Personnel File.

During trial, the Court also sustained the government's objections to key testimony by government's witness Matthew Kallman, namely that the prior Montgomery Police Chief caused a car accident with another police officer while driving

11

under the influence. The Chief released that officer's entire personnel file to the media in an attempt to discredit and intimidate that officer from pursuing a legal matter against the Chief, and was ultimately successful. This showed a pattern and practice in the Montgomery Police Department, and should have been allowed into evidence. See Excerpt from Grand Jury Testimony of Matthew Kallman, pages 39-40, attached hereto.

### Ground 8
### The Court Erred in Excluding Testimony from Matthew Kallman Regarding the Extent of Information Released by MPD.

The Court also prohibited Kallman from testifying in conformity with his sworn grand jury testimony that information is released to private investigators "all the time, even today." This information was also key to proving that release of information was part of a pattern and practice at the Montgomery Police Department, information that should have reached the jury. See Excerpt from Grand Jury Testimony of Matthew Kallman, pages 39-42, attached hereto.

### Ground 9
### The Court Erred in Allowing Jeff Downs to Testify That the Chief of Police Planned to Fire the Defendant.

The Court admitted into evidence, certain papers which would indicate that the Mayor was considering terminating the Defendant's employment as a police officer. This was irrelevant and highly prejudicial, as it added further aura of wrongdoing to what the Defendant did, without regard to the specific charges against him. It is likely that the jury was confused into thinking that if the Mayor was going to fire the Defendant, then what he did must have been very bad.

### Ground 10
### The Cumulative Result of Error Greatly Prejudiced the Defendant.

The afore-mentioned rulings were incorrect and greatly prejudiced the Defendant.

12

The nature and extent of the jury's deliberations show the case was very close, making each ruling very important. Thus, the cumulative result of the previously discussed errors was that the Defendant was prejudiced, and wrongfully convicted.

### Ground 11
### The Statute is Unconstitutionally Vague and/or Overbroad, Especially as Applied to the Facts of This Case, and the Indictment Drafted by the Prosecution.

The statute, as applies to Defendant Salum, is impermissibly vague. The Defendant incorporates herein, by reference, the relevant portions of his prior motion to Dismiss (Doc. 27).

While the courts have held in various cases that the word corruptly is not impermissibly vague, or overbroad whether the "omnibus clause" of §1503 can be used to convict someone three degrees of separation from anything even arguably corrupt is a question of first impression.

### III. REQUESTED RELIEF

WHEREFORE, above premises considered, the Defendant respectfully moves this Court for an ORDER acquitting the Defendant of both counts of the Indictment; or,

In the alternative, for an ORDER granting the Defendant a new trial.

RESPECTFULLY SUBMITTED on November 17, 2005.

          GEORGE DAVID SALUM, III
          Defendant

          /s/ Julian L. McPhillips, Jr.
          JULIAN L. McPHILLIPS, JR.
          Alabama Bar No. MCP004

          /s/ Allison H. Highley
          ALLISON H. HIGHLEY
          Washington Bar No. 34145
          Attorneys for the Defendant

OF COUNSEL:
McPhillips Shinbaum, LLP
Post Office Box 64
Montgomery, Alabama 36101
(334) 262-1911

**CERTIFICATE OF SERVICE**

I hereby certify that on this date a copy of the foregoing was delivered to Assistant United States Attorney Dixie A. Morrow via e-mail.

/s/ Allison H. Highley
ALLISON H. HIGHLEY

**ORIGINAL**                                                1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE MIDDLE DISTRICT OF ALABAMA

 3                     NORTHERN DIVISION

 4                        GRAND JURY

 5

 6

 7   IN RE:

 8   GRAND JURY INVESTIGATION          CRC 04-0388

 9

10

11

12

13

14

15                  * * * * * * * * * *

16

17        BE IT KNOWN that on TUESDAY, MARCH 15, 2005, the

18   testimony of MATTHEW KALLMAN, JR., was taken before the

19   Grand Jury of the United States District Court for the

20   Middle District of Alabama, Northern Division, in the Grand

21   Jury Room, United States Courthouse, One Church Street,

22   Montgomery, Alabama; DIXIE A. MORROW interrogating.

23

24                  * * * * * * * * * *

25
```

have any contact with Leon Carmichael, Steve Glassroth, Lieutenant Salum, or Sergeant King related to the matters that we have discussed this morning?

A. No.

MS. MORROW: Those are all of my questions of Mr. Kallman. Do the ladies and gentlemen of the grand jury have any additional questions?

GRAND JUROR: I have one. I'd like to know, you said he was a bad penny.

THE WITNESS: Yes, sir.

GRAND JUROR: And you associated with him up until he went to prison?

THE WITNESS: Yes, sir.

GRAND JUROR: And -- and when this thing started breaking out, you being an ex-cop, why didn't you come forward and let the police know at the time before it got as bad as it did and make you look bad in the situation?

THE WITNESS: I let the police know when I felt that they had crossed the line. And that was really, you know, just judgment. It was --

GRAND JUROR: You being a cop, he had already crossed the line when he got the information.

THE WITNESS: Like I testified to her, information is a gray area. I don't -- I did not believe that it was illegal to obtain information from the City. Against rules

1    and regs, yes.

2           And I also -- just like the chief of police
3    released -- and this is the way I looked at it.  The chief
4    of police released records on Rhett Hooper, who followed him
5    drinking and driving, and used his position to release
6    personal records and personal -- direct personal information
7    about his firing or resigning.  And nobody seemed to think
8    anything was wrong with that.

9           And as far as taking information from the City, I
10   didn't -- and to be honest with you, if it wasn't for being
11   here now, I still wouldn't think so.  You can go to the
12   circuit clerk's office and pull files on any criminal case
13   over there.  You can't take them from the courthouse, but
14   you can look at them.

15         MS. MORROW:  Well, let me just follow up the grand
16   juror's question, Mr. Kallman.

17   Q.    There's a world of difference between matters of
18   public record, case files that are available to the general
19   public for the asking in a clerk's office, and the personnel
20   file and official photograph of a police officer or a former
21   police officer.  While you were at the police department,
22   was it common, in your experience, for private investigators
23   to be given personnel files or photographs of police
24   officers just by asking for it?
25   A.    Would I say common?  No.  Would I say it

```
1    happened?  Sure.
2         Q.   You know that it happened or you suspect that it
3    happened?
4         A.   I would -- a lot of things happened at the police
5    department that wasn't supposed to happen.
6         Q.   Well, that's not an answer to my question.  Do you
7    know that a private investigator other than John White was
8    ever given a police officer's personnel file or photograph
9    simply by asking for it from someone in the department?
10        A.   Oh, sure.
11        Q.   You do know that that happened?
12        A.   Sure.  It -- it --
13        Q.   When?
14        A.   I'm sure it happens today.
15        Q.   During what period of time did that happen?
16        A.   I was there eight years.
17        Q.   Who was the private investigator who was given
18   that information by simply asking for it?
19        A.   It was -- it just happened.
20        Q.   Well, which police officers' files or photographs
21   were given to a private investigator?
22        A.   Now, I wouldn't say files, you know.
23        Q.   Well, that's what I'm asking you, personnel files
24   or photograph, not case files and not matters of public
25   record.  Personnel files or photographs.  When do you know
```

```
 1   that having happened that had happened while you were a
 2   police officer?
 3       A.   Well, let's see.  It happened to me.
 4       Q.   What private investigator received your personnel
 5   file and photograph?
 6       A.   It happened at -- the chief of police turned over
 7   paperwork of my file to the bank, Aliant Bank.
 8       Q.   Well, is that a private investigator?
 9       A.   Well, it's the public.
10       Q.   I'm asking you about a private investigator
11   working for a criminal defendant or anyone else asking for
12   and receiving an officer's personnel file or photograph.
13       A.   I can't name a name, but it's happened.
14       Q.   And you know that why?  Because it was your file,
15   someone you know's file?                  — the MPD
16       A.   It was common talk in the hallways for everybody
17   down there.  (I mean, it was just an information highway)  I
18   mean, if you want me to look back -- you know, it's hard for
19   me to look back and give you dates on when this exactly
20   happened.
21       Q.   I'm not asking for a date about this.  You just
22   answered this grand juror's question by saying that this has
23   happened before.
24       A.   Yes.  I'd say yeah.
25            MS. MORROW:  Sir, I didn't mean to interrupt you.
```

REPORTER'S CERTIFICATE

STATE OF ALABAMA

MONTGOMERY COUNTY

I, C. Dawn Ashcraft, Court Reporter and Commissioner for the State of Alabama at Large, hereby certify that on TUESDAY, MARCH 15, 2005, I reported the GRAND JURY PROCEEDINGS in the matter of the foregoing cause, and that pages 2 through 44 contain a true and accurate transcription of the said proceedings.

I further certify that I am neither kin nor counsel to any of the parties to said cause, nor in any manner interested in the results thereof.

This 16th day of April, 2005.


*C. Dawn Ashcraft*
C. DAWN ASHCRAFT, Court Reporter
Commissioner for the State
of Alabama at Large

MY COMMISSION EXPIRES:   8/8/07